UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

CHRISTA DIAS, :
:
    Plaintiff, : NO: 1:11-CV-00251
:
 v. :
: **OPINION AND ORDER**
ARCHDIOCESE OF CINCINNATI, :
et al., :
:
    Defendants. :

This matter is before the Court on Defendants' Motion to Dismiss (doc. 5), Plaintiff's Response in Opposition (doc. 7), and Defendants' Reply (doc. 9). The Court held a hearing on this matter on September 8, 2011, but then held Defendants' Motion in abeyance pending the outcome of the Supreme Court's decision in Hosanna-Tabor Evangelical Lutheran Church and School v. Equal Employment Opportunity Commission, which issued on January 11, 2012. 132 S.Ct. 694 (2012). Plaintiff moved to lift the Order holding this matter in abeyance (doc. 14), and the parties provided supplemental briefing (docs. 14, 16, 17). The Court held a second hearing on March 22, 2012, and this matter is now ripe for decision. For the reasons indicated herein, the Court GRANTS Plaintiff's motion (doc. 14), and DENIES Defendants' Motion to Dismiss (doc. 5).

**I. Background**

These are the facts as alleged in Plaintiff's Complaint. Plaintiff Christa Dias ("Dias") began her employment with

Defendants Holy Family School in August 2008 and St. Lawrence School in August 2009, two private Catholic schools (doc. 1). Plaintiff worked as the Technology Coordinator, which meant she oversaw the computer systems at the schools and instructed students on computer usage (Id.).

Plaintiff is not a Catholic, and Defendants employed her and other non-Catholics (Id.). However, Defendants did not permit non-Catholic teachers to teach religion classes (doc. 14). As such, Plaintiff had no responsibility for religious instruction at the schools (Id.).

On Friday, October 15, 2010, Plaintiff notified Jennifer O'Brien ("O'Brien"), the principal of Holy Family School, that she was five and a half months pregnant, and that she would need maternity leave beginning in February 2011 (Id.). Plaintiff is not married (Id.). O'Brien informed Plaintiff that she did not consider Plaintiff's pregnancy to be a problem and congratulated her (Id.). However, O'Brien indicated that she would have to raise the matter with the pastor of Holy Family Church, Reverend James Kiffmeyer. Later that day, O'Brien called Plaintiff to inform her that she had spoken with a colleague from another school about Plaintiff's pregnancy, and that Plaintiff would likely be terminated immediately because she was pregnant and unmarried. O'Brien agreed to delay speaking with Rev. Kiffmeyer until the end of the following week (Id.).

2

On Monday, October 18, 2010, after being told she would likely be terminated for being pregnant and unmarried, Dias informed O'Brien that she was pregnant as a result of artificial insemination, and not as a result of premarital sexual intercourse (Id.).

On Wednesday, October 20, 2010, Dias informed Alma Lee Joesting ("Joesting"), the principal of St. Lawrence School, that she was pregnant (Id.). Ms. Joesting asked Dias if she was married, to which Dias responded, "No." Joesting stated that Dias's pregnancy "was going to be a problem." (Id.). Later that day, Plaintiff informed O'Brien that she had also notified Joesting about her pregnancy (Id.). O'Brien stated that she would promptly call Rev. Kiffmeyer to speak with him about the pregnancy (Id.). Roughly one hour later, O'Brien informed Plaintiff that Rev. Kiffmeyer had instructed her to contact the human resources department at the Archdiocese for direction (Id.). Sometime later the Director of human resources, Bill Hancock, instructed the schools that they had to terminate Plaintiff's employment (Id.). The schools did so, on October 21 and 22, 2010, informing Plaintiff her termination was for "failure to comply and act consistently in accordance with the stated philosophy and teachings of the Roman Catholic Church" (Id.). Defendants initially stated that Dias was discharged for "becoming pregnant outside of marriage," but then changed their reason for terminating Dias to her use of artificial

3

insemination to become pregnant, which they state is also a violation of the philosophy and teachings of the Roman Catholic Church (Id.).

Plaintiff filed her Complaint on April 21, 2011, alleging that Defendants' actions amounted to pregnancy discrimination under federal and state law, and that Defendants breached her employment contracts without good cause (Id.). Defendants filed the instant motion to dismiss, contending Plaintiff's role at the school was religious such that the "ministerial exception" to Title VII should apply, thus permitting their action (doc. 5). Defendants further contend Plaintiff violated a clause in her employment contract that she would "comply with and act consistently in accordance with the stated philosophy and teachings of the Roman Catholic Church" (Id.).

**II. The Applicable Standard**

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) requires the Court to determine whether a cognizable claim has been pled in the complaint. The basic federal pleading requirement is contained in Fed. R. Civ. P. 8(a), which requires that a pleading "contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Westlake v. Lucas, 537 F.2d 857, 858 (6th Cir. 1976); Erickson v. Pardus, 551 U.S. 89 (2007). In its scrutiny of the complaint, the Court must construe all well-pleaded facts liberally in favor of

4

the party opposing the motion. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). A complaint survives a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Courie v. Alcoa Wheel & Forged Products, 577 F.3d 625, 629-30 (6th Cir. 2009), quoting Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009), citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

A motion to dismiss is therefore a vehicle to screen out those cases that are impossible as well as those that are implausible. Courie, 577 F.3d at 629-30, citing Robert G. Bone, Twombly, Pleading Rules, and the Regulation of Court Access, 94 IOWA L. REV. 873, 887-90 (2009). A claim is facially plausible when the plaintiff pleads facts that allow the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Iqbal, 129 S.Ct. at 1949. Plausibility falls somewhere between probability and possibility. Id., citing Twombly, 550 U.S. at 557. As the Supreme Court explained,

> "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 1950.

The admonishment to construe the plaintiff's claim liberally when evaluating a motion to dismiss does not relieve a plaintiff of his obligation to satisfy federal notice pleading

5

requirements and allege more than bare assertions of legal conclusions. Wright, Miller & Cooper, Federal Practice and Procedure: § 1357 at 596 (1969). "In practice, a complaint . . . must contain either direct or inferential allegations respecting all of the material elements [in order] to sustain a recovery under some viable legal theory." Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1106 (7th Cir. 1984), quoting In Re: Plywood Antitrust Litigation, 655 F.2d 627, 641 (5th Cir. 1981); Wright, Miller & Cooper, Federal Practice and Procedure, § 1216 at 121-23 (1969). The United States Court of Appeals for the Sixth Circuit clarified the threshold set for a Rule 12(b)(6) dismissal:

> [W]e are not holding the pleader to an impossibly high standard; we recognize the policies behind Rule 8 and the concept of notice pleading. A plaintiff will not be thrown out of court for failing to plead facts in support of every arcane element of his claim. But when a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist.

Scheid v. Fanny Farmer Candy Shops, Inc., 859 F.2d 434, 437 (6th Cir. 1988).

**III. Discussion**

At the March 22, 2012 hearing it became clear to the Court that there are three basic issues before it: First, whether the ministerial exception applies to this case in light of the Supreme Court's recent ruling in Hosanna-Tabor; second whether Plaintiff has raised legally sufficient claims for breach of contract and pregnancy discrimination; and third, whether this case raises issues of entanglement between church and state and/or

6

violates the Free Exercise Clause, such that Plaintiff has no recourse. The Court will consider these issues seriatim.

**A. The Ministerial Exception**

Both parties cite to <u>Bollard v. California Province of the Society of Jesus</u>, 196 F.3d 940 (9th Cir. 1999), which provides an explanation of this judicial doctrine:

> The source of the ministerial exception is the Constitution rather than the statute. Insofar as race, sex, and national origin are concerned, the text of Title VII treats an employment dispute between a minister and his or her church like any other employment dispute. The statute does provide two exemptions from its nondiscrimination mandate for religious groups. One permits a religious entity to restrict employment "connected with the carrying on ... of its activities" to members of its own faith, 42 U.S.C. § 2000e-1(a); the other permits parochial schools to do the same, <u>Id</u>. § 2000e-2(e). But neither of these statutory exceptions removes race, sex, or national origin as an impermissible basis of discrimination against employees of religious institutions. Nor do they single out ministerial employees for lesser protections than those enjoyed by other church employees.
>
> Despite the lack of a statutory basis for the ministerial exception, and despite Congress' apparent intent to apply Title VII to religious organizations as to any other employer, courts have uniformly concluded that the Free Exercise and Establishment Clauses of the First Amendment require a narrowing construction of Title VII in order to insulate the relationship between a religious organization and its ministers from constitutionally impermissible interference by the government. These First Amendment restrictions on Title VII provide important protections to churches that seek to choose their representatives free from government interference and according to the dictates of faith and conscience.

<u>Id</u>. at 945 (internal citations removed). The ministerial exception strikes a balance between the government's interest in preventing certain types of discrimination and a "religious institution's constitutional right to be free from judicial

7

interference in the selection of its [ministerial employees]." Hollins v. Methodist Healthcare, Inc., 474 F.3d 223, 225 (6th Cir. 2007). But courts have consistently held that judicial intervention in disputes involving employees whose primary duties are secular does not violate the First Amendment's guarantee of religious freedom. "Where no spiritual function is involved, the First Amendment does not stay the application of a generally applicable law such as Title VII to the religious employer unless Congress so provides." E.E.O.C. v. Roman Catholic Diocese of Raleigh, N.C., 213 F.3d 795, 801 (4th Cir. 2000).

"For the ministerial exception to bar an employment discrimination claim, two factors must be present: (1) the employer must be a religious institution, and (2) the employee must be a ministerial employee." Hosanna-Tabor, 597 F.3d at 778. Here, Plaintiff concedes that Defendants are religious institutions; thus, the first requirement under the ministerial exception is present. The question before the Court then, is whether Defendant has established that Plaintiff in this case was a ministerial employee. Hosanna-Tabor, 132 S.Ct. 694, 709 n.4 (2012)(the exception acts as an affirmative defense, such that it is Defendant's burden to prove Plaintiff is a ministerial employee).

When the Supreme Court weighed in on the ministerial exception with its recent opinion in Hosanna-Tabor, it unanimously upheld the right of religious institutions "to select and control who will minister to the faithful," and thus barred "suits brought

8

on behalf of ministers against their churches, claiming termination in violation of employment discrimination laws." 132 S.Ct. 694, at 696, 698 (2012). However, the high court refrained from addressing ministerial exception jurisprudence as a whole and from articulating a test or standard for determining who qualifies as a ministerial employee. Rather, the Court limited its decision to the facts of the case before it, determining that the plaintiff in Hosanna-Tabor, Cheryl Perich, was a ministerial employee. The Court identified facts related to Perich's employment and explained how those facts contributed to a conclusion that she was a ministerial employee. The Court noted that the school "held Perich out as a minister," that it issued her a "diploma of vocation" according her the title "Minister of Religion, Commissioned." Hosanna-Tabor, 132 S.Ct. at 707. Perich "was tasked with performing that office 'according to the Word of God and the confessional standards of the Evangelical Lutheran Church as drawn from the Sacred Scriptures.'" Id. The church, "prayed that God 'bless [her] ministrations to the glory of His holy name." Id. In a supplement to the diploma, the congregation undertook to periodically review Perich's "skills in ministry" and "ministerial responsibilities," and to provide for her "continuing education as a professional person in the ministry of the Gospel." Id.

The Court also noted that Perich's "title as a minister reflected a significant degree of religious training, followed by a formal process of commissioning." Hosanna-Tabor, 132 S.Ct. at

9

707.  She had to complete eight college-level courses in subjects such as biblical interpretation, church doctrine, and the ministry of the Lutheran teacher.  Id.  After finishing the schooling, she had to "obtain the endorsement of her local Synod district by submitting a petition that contained her academic transcripts, letters of recommendation, personal statement, and written answers to various ministry-related questions," and then pass an oral examination at a Lutheran college.  Id.  Perich, as a result of her training and commission, was granted tenure, and "her call could be rescinded only upon a supermajority vote of the congregation—a protection designed to allow her to 'preach the Word of God boldly.'"  Id.

Finally, the Court reviewed Perich's job duties, noting that she taught her students religion four days a week, and led them in prayer three times a day.  Id.  "Once a week, she took her students to a school-wide chapel service, and-about twice a year-she took her turn in leading it, choosing the liturgy, selecting the hymns, and delivering a short message based on verses from the Bible."  Id.  During her last year of employment, Perich also led her fourth graders in a brief devotional exercise each morning.  Id.  Considering all of the above, the formal title given to Perich by the church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the church, the Court concluded she was a minister covered by the ministerial exception.  Id.

Plaintiff here contends none of the facts applicable to Perich are applicable to her (doc. 14).  Defendants here did not hold Plaintiff out as a minister, they did not give her any sort of religious title or commission, and the congregations of the Defendant churches took no role in reviewing her "skills in ministry" or her "ministerial responsibilities," because she had none (Id.).  Plaintiff argues Defendants never charged her with teaching the faith, participating in religious services, or leading devotional exercises, and she never held herself out as a minister, nor did she ever undergo religious training (Id.).  In fact, as a non-Catholic, Defendants would not permit her to teach basic Catholic doctrine (Id.).

Defendants respond that in their view Plaintiff was a minister based on her "role as a Catholic role model," and her "teaching and interacting with impressionable students" (doc. 16). Plaintiff contends in her reply that no court has held a teacher at a parochial school is a ministerial employee solely by virtue of his or her position as a teacher (doc. 14).  Quoting the Northern District of Indiana, Plaintiff contends "the sectarian nature of [a] school's educational activities does not, standing alone, make a teacher a 'minister' for purposes of exempting that person from the FLSA's definition of 'employee.' To hold otherwise would create an exception capable of swallowing up the rule." Equal Employment Opportunity Commission v. First Baptist Church, No. S91-179M, 1992 U.S. Dist. LEXIS 14479, *38-9 (N.D. Ind. June 8, 1992).  Moreover,

11

Plaintiff cites a host of authorities showing the analysis of whether a teacher is a minister involves more than the teacher's affiliation with a religious school (doc. 14)[1].

Having reviewed this matter, the Court concludes that Plaintiff is correct that her duties while employed by Defendants show that she was not a minister for purposes of the ministerial exception. Clearly, Plaintiff performed duties as a computer teacher and overseeing computer systems. The Court finds

---

[1] Plaintiff cites <u>Braun v. St. Pius X Parish</u>, No. 09-CV-779-GKF-TLW, 2011 U.S. Dist. LEXIS 123750 at *9 (N.D. Okla. October 25, 2011)("Defendants cite no authority. . .for the argument that a teacher at a parochial school is a minister or qualifies for the ministerial exception."); <u>E.E.O.C. v. Mississippi College</u>, 626 F.2d 477, 485 (5th Cir. 1980)("That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern."); <u>Geary v. Visitation of Blessed Virgin Mary Parish School</u>, 7 F.3d 324, 331 (3rd Cir. 1993)("We believe, however, that notwithstanding Geary's apparent general employment obligation to be a visible witness to the Catholic Church's philosophy and principles, a court could adjudicate Geary's claims without the entanglement that would follow were employment of clergy or religious leaders involved."); <u>Redhead v. Conference of Seventh-Day Adventists</u>, 440 F.Supp.2d 211, 221-222 (E.D. N.Y. 2006) (holding that a teacher at a Seventh Day Adventist elementary school does not classify as a ministerial employee because her teaching duties were primarily secular and her daily religious duties "were limited to only one hour of Bible instruction per day"); <u>Guinan v. Roman Catholic Archdiocese of Indianapolis</u>, 42 F.Supp.2d 849, 854 (S.D. Ind. 1998) (holding that a fifth grade teacher who taught at least one class in religion per term and organized Mass once a month at a religious elementary school was not a ministerial employee); and <u>DeMarco v. Holy Cross High School</u>, 4 F.3d 166, 172 (2d Cir. 1993) (holding that applying the ADEA to a math teacher who led students in prayer and accompanied them to religious services at a religious high school would not result in excessive entanglement under the Establishment Clause).

dispositive that as a non-Catholic, Plaintiff was not even permitted to teach Catholic doctrine. Plaintiff had received no religious training or title and had no religious duties. The authorities cited by Plaintiff show that it is not enough to generally call her a "role model," or find that she is a "minister" by virtue of her affiliation with a religious school. As such, Plaintiff's claims are not barred by the ministerial exception.

**B. The Contract**

Defendants further argue that Plaintiff's case should be dismissed based on a clause in her employment contract stating that she would "comply with and act consistently in accordance with the stated philosophy and teachings of the Roman Catholic Church" (doc. 5). Defendants proffer evidence, a Catechism of the Catholic Church, that states the technique of artificial insemination is considered gravely immoral (<u>Id</u>.). As such, they argue they were completely justified in terminating Plaintiff's employment based on the fact that Plaintiff admitted undergoing such procedure (<u>Id</u>.). Defendants further argue that Sixth Circuit authority has consistently upheld the sort of "morals clause" that they are invoking in this case (<u>Id</u>. citing <u>Cline v. Catholic Diocese of Toledo</u>, 206 F.3d 651 (6th Cir. 2000)(morals clause applied equally to male and female employees provides no basis for pregnancy discrimination), <u>Boyd v. Harding Academy of Memphis</u>, 88 F.3d 410 (6th Cir. 1996)(morals clause upheld prohibiting employees from engaging in premarital sex)).

13

Plaintiff responds that the authorities cited by Defendant involved gender-neutral application against extramarital sexual activity (doc. 17). In her view, this case is rather about policies against pregnancy out of wedlock or artificial insemination, policies that are not gender-neutral because they only apply to women (Id.). As such, she argues the contract term is illegal and should be severed from the contract as unenforceable under Ohio law (Id.).

Plaintiff further responds that as the contracts she signed made no reference to artificial insemination, Defendants' contention that she engaged in bad faith by signing such contracts is contingent upon proof that she knew that such conduct was against the teachings and philosophy of the church (doc. 14). Such question, she contends, is a question of fact that cannot be resolved in a motion to dismiss pursuant to Rule 12(b)(6) (Id.).

The Court finds the determination regarding Plaintiff's view of the contract a close call. However, in the context of Rule 12(b)(6), it is the Court's obligation here to construe all well-pleaded facts liberally in favor of the Plaintiff. The Court finds facts alleged in the Complaint allow it to question the applicability of the morals clause in this matter. An enforceable contract requires a meeting of the minds. Alpha Telcoms, Inc. v. IBM, 241 Fed. Appx. 301, 304 (6th Cir. 2007). Here, Defendant is trying to use against Plaintiff a broad contract provision that does not specifically prohibit artificial insemination. It appears

to be a factual question whether Plaintiff, a non-Catholic, knew that artificial insemination was gravely immoral in the eyes of the church, and would be a basis for her termination.  In fact, as alleged in the Complaint, Plaintiff first announced her pregnancy in the context of seeking maternity leave, to which she understood she would be entitled.  Such allegation suggests Plaintiff had no idea there would be a problem with her pregnancy.  Moreover, as alleged in the Complaint, Plaintiff performed her duties under the contract, and the only basis for her termination was Defendants' interpretation of the morals clause.  Simply put, in the context of Rule 12(b)(6) Plaintiff's claim for breach of contract "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Courie, 577 F.3d 625, 629-30 (6th Cir. 2009), quoting Iqbal, 129 S.Ct. 1937, 1949 (2009), citing Twombly, 550 U.S. 544 (2007).

**C. Pregnancy Discrimination**

In 1978, Congress enacted the Pregnancy Discrimination Act ("PDA"), which amended Title VII to specify that sex discrimination under Title VII includes discrimination on the basis of pregnancy.  42 U.S.C. § 2000e(k); Shaw v. Delta Airlines, Inc., 463 U.S. 85, 89 (1983).  By incorporating the PDA into Title VII, Congress manifested its belief that discrimination based on pregnancy constitutes discrimination based upon sex.

The Sixth Circuit has provided guidance in the context of religious institutional reaction to pregnant employee teachers in

15

two cases in which defendants did not invoke the ministerial exception. Its decision in Boyd, 88 F.3d 410, 414 (6th Cir. 1996), shows that it views as a legitimate nondiscriminatory justification for termination the violation of a prohibition against employees engaging in extra-marital sex. In Boyd, the court found valid the defendant's argument that it fired the plaintiff not for being pregnant but for engaging in sex outside marriage. Id. However, the court also noted the defendant in Boyd proffered evidence that it applied the policy equally to both male and female employees. Id. Of particular import to the case at bar, the Sixth Circuit suggested that had the plaintiff in Boyd become pregnant by artificial insemination, her situation would have been different from that of an employee who engaged in extra-marital sexual intercourse. Id. at 412, fn. 1.

In Cline, 206 F.3d 651 (6th Cir. 1999), the Sixth Circuit confronted a situation nearly identical to that of this case. A Catholic teacher's contract was not renewed for violating a provision in the employee handbook to "uphold, by word and example. . . teachings of the Roman Catholic Church," when plaintiff acknowledged she became pregnant before her marriage. Id. at 656. The Sixth Circuit reversed the district court's grant of summary judgment to the Defendant Catholic Church, finding that it too hastily sided with the church. Id. at 667. The court found evidence showing the defendant focused more on the fact of her pregnancy than her sexual activity and that the policy was not

16

applied equally among men and women.  Id.  The court further found the defendant acknowledged it was plaintiff's pregnancy alone that signaled to them that plaintiff had engaged in sex, and that it did not otherwise inquire as to whether male teachers engaged in premarital sex.  Id.  According to the Sixth Circuit, such evidence raised a genuine issue of material fact as to whether the defendant enforced its policy solely by observing the pregnancy of its female teachers, which would constitute a form of pregnancy discrimination.  Id.

This case is at an earlier procedural stage than those in Boyd and Cline.  The Court only need to determine whether Plaintiff has alleged a plausible complaint of pregnancy discrimination.  As the allegations in the Complaint show Defendants made the decision to terminate Plaintiff initially for being pregnant, and then later for being artificially inseminated, the Court finds she has a plausible claim.  Under the precedent, it appears Defendants' justification for their actions could ultimately have merit should it be proven to have been based on a prohibition of extramarital sexual activity.  The allegations do not indicate this to be the case.  Moreover, Boyd suggests that artificial insemination should be viewed differently, and in any event, that any policy must be applied equally to both genders.  These questions are premature to address without further discovery.  As such, under the circumstances of this case, the Court finds it inappropriate to grant Defendant's motion to dismiss.

17

**D.  Entanglement and Free Exercise**

Defendant raises further arguments that court intervention in this matter would run afoul of the First Amendment (doc. 16).  Plaintiff contends the proper analysis is completed after consideration of the applicability of the ministerial exception (doc. 17).  The Court agrees with Plaintiff.  Precedent shows, as indicated herein, that religious institutions are, and have been, subject to court review of Title VII employment discrimination claims made by non-ministerial employees all across the country.

**IV.  Conclusion**

Having reviewed this matter, the Court concludes Plaintiff was a non-ministerial employee of Defendants.  The Court further concludes she has raised plausible claims of pregnancy discrimination and breach of contract. Accordingly, the Court GRANTS Plaintiff's Motion to Lift Order Holding Matter in Abeyance (doc. 14), DENIES Defendants' Motion to Dismiss (doc. 5), and SETS this matter for Preliminary Pretrial Conference at 2:00 P.M. on May 1, 2012.

SO ORDERED.

Dated: March 29, 2012          /s/ S. Arthur Spiegel
                               S. Arthur Spiegel
                               United States Senior District Judge